Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Mary S. Shostak, presiding. Please be seated, gentlemen. Good morning. Your Honors, the first case on the docket this morning is 2-22-0379, Charles D. Atwater Associates, Inc. Claims of Appellee and Cross-Appellant v. North States Steel Corp. Defendant Appellant and Cross-Appellant. Arguing on behalf of the Appellee Cross-Appellant, Mr. Charles A. Dunlap. Arguing on behalf of the Appellee Cross-Appellant, Mr. Carl E. Best II. Good morning. We, the court officer said he spoke to everyone about their times, so you'll understand what your time is. It's 15, 20, 10, and 5. So you'll have your opportunities, and he'll keep the time for us. All right? Thank you. Mr. Dunlap, are you ready to proceed? One clarification. Yes, sir. Mr. James Dunlap is going to be talking at Charles. Oh, okay. So now I'm going to have to talk to which Dunlap I'm speaking to. Okay, James. You can proceed. All right, good morning, Your Honor. Good morning. James Dunlap on behalf of North States Steel. The appellant is appealing the trial court's judgment as to counts 1, 4, and 6. A brief summary of the undisputed facts clearly show a contract modification. North States told Atwater at a meeting on October 3rd of 2008 it would not be paying commissions on sales that did not have sufficient profit margin. The trial court ruled otherwise. Why is the trial court's ruling against the manifest way to the evidence? Well, there's several things. Atwater regularly cashed checks after receiving commission reports that explicitly zeroed out commissions, and this happened for a period of over three years. Did they zero out before the conversation in the parking lot? That was the first time that Atwater noticed it according to the testimony, and I believe that would be the first time, yes. After that? The first time it was noticed was before that. It was an invoice from June, and then they discussed that invoice at the October 3rd, 2008 meeting. Okay, go ahead, I'm sorry. Okay. So as I mentioned, North State repeatedly communicated on more than 40 occasions its application of the contract modification to Atwater. Through these zero outs and copies of sales invoices and commission reports. And Atwater regularly cashed these checks, reflecting the application. So you're alleging that's acquiescence, that he's just cashed those checks? Yes, yes. Because he was aware of the fact that these commissions were being zeroed out. But he kept asking. He kept saying to the woman there, Ms. Atwater, he kept, or Ms., the sister of the corporation, he kept saying, you know, I didn't get my check, I didn't get paid for this, and she kept saying, let me look into it and I'll get back to you. So how is that acquiescence when he was continuing to question the failure to pay fees on that? Ms. Myers looked into the questions asked by Mr. Atwater, and he received a commission report thereafter and a check, and he cashed that check. Well, it had to live, right? Well, certainly. You would agree there's a lot of different factors that go into deciding and reaching an agreement as to what you're going to pay a rep, right? There's a lot of different factors. For example, the loss provision, you know, he's going to get 2% even if there's a loss. That's not uncommon, especially in this particular industry where there's a lot of fluctuation in inventory, et cetera. You've got to move the inventory. So, you know, the argument that there was no agreement to that is kind of refuted by the industry practices, right? I don't believe that. I believe that it's the opposite in regards to the contractual language because it says depends upon the profitability. 3% if there's a profit. If there's no profit, 2%. Based upon the definitions we've provided, profitability does not include losses, and that's the Black's Law dictionary definition as well as, I believe, Merriam-Webster's theorem. So if you put the two together, it's like you're nullifying the second part there, that profitability will be determined, you know, this commission will be determined on the profitability. All right, so during the course of Atwater's representation of the North States, there were thousands of emails sent, and Atwater did not produce a single written communication that was objecting to North States' application of a contract modification until his termination letter. And Atwater did ask about when am I going to get another paycheck, but he never complained about, in a written communication, about the specific amount of a check that he received. And the zeros out on the commission report were actually even done on one instance in front of Mr. Atwater. Well, starting in October 2008, Atwater reportedly, repeatedly questioned Myers about the timing of the checks and the amounts of the commission checks. And she kept saying, I'll look into it, and we'll catch them, I think is what she said. In October? October of 2008 was the first time. Yeah, there was an email. It was October 7. And, yeah, he said he understood he was going to receive zero outs, and did you look into the other two invoices? Right, right, because you raised waiver, and the trial court rejected that. They, yes, they based that on our, I mean, that's a different argument that modification was required to be proven in order for us to get to waiver. And an oral modification is not any part of the elements of waiver. Counsel, what's the consideration for the modification? The forbearance of the right to terminate under the contract. And I believe it's Paragraph 9 of the contract. The contract can be terminated by either party upon 48 hours' notice. So the first issue that was brought up on appeal dealt with the contract's interpretation of the commission section. And we've kind of gotten into this a little bit. It essentially isolated the Paragraph 2 and did not look at the text as a whole, thus ignoring established jurisprudence. And we talked about the definition of profitability, and the court's definition of profitability does not match what the case law says you're supposed to do. I mean, you're supposed to look to the dictionary definitions to find the terms of plain meaning. So Atwater further admitted that he was aware of these zero outs. And despite the fact that there were these zero outs, Atwater did not quit. So he kept working and he kept cashing checks. So even absent an express agreement under the law, Atwater's conduct should be implied. And there's a case that's similar on that. That's the Davison v. Orta Trustees of Carl Sandburg College. In regards to the equitable estoppel, and for the similar reasoning that the court erred in requiring a modification to be proven to establish waiver, the same goes for the court's ruling regarding equitable estoppel. The sole basis of the court denying or even looking at equitable estoppel was the fact that it required or it thought that Northside was required to establish its modification. And that's contrary to the case law. And because the contract is upon a manifest way that the evidence was modified, no attorney's fee should have been awarded because it would not kick in the Illinois Sales Representative Act. And the argument is based on the actions of Mr. Atwater? The modification of the contract, yes. It's based upon his knowledge of the facts. His behavior, accepting payment, and cashing the checks. Yes, that's correct, Your Honor. In regards to paragraph 4 of the contract, the court also awarded damages based upon its interpretation of an exclusivity provision. When the court's doing this, it found that the paragraph was unambiguous and relied heavily on the heading titled Exclusive Representation. That's talking about the house accounts? The heading of the paragraph, Exclusive Representation. Yes, the only time exclusive is mentioned in the body of that paragraph is referring to house accounts. Correct. Yes, and the trial court ruled that that gave Atwater an exclusive territory. And nowhere in the contract's language does it actually state exclusive territory. Right, but the contract said, talked about the named territory except the house accounts. The territory except house accounts. Except the house accounts, yes. Correct. And so what the court ended up doing was applying it to North State's in-house employees and ruling that their in-house employees could not contact any customers within that defined territory. And that would make it impossible for North State to grow its business other than through Atwater. And that just does not seem like it's an appropriate interpretation. Go ahead. Further regarding this issue, the sole basis for the award of damages was based upon an Exhibit 6 that was admitted that contained hearsay and double hearsay. Did you object to trial? We did, yes. You did? Yes. Thank you. Moving to the next issue, the trial court found that North State's acted in bad faith and awarded exemplary damages in conflict with established case law, namely the Maher Associates case. That's a second district case that requires finding beyond bad faith for there to be an award of exemplary damages. You skipped over a material breach that you had raised. Yes. I was going to go back to that. Oh, okay. Okay, I'm sorry. I'm sorry. Go ahead. I can address that right now. No. Go along with exemplary damages on top of that. Yes. So like Maher Associates, like I said, this is a 2000, a second district case, and essentially the case law is clear that there has to be like a finding tantamount to a crime. And the basis for the court's finding on this was late payments, which weren't even really at issue because those were ultimately paid, and that's not enough to rise to that standard, just like the late payments. How much deference are the credibility determinations of the trial court entitled to on this? Could you repeat that? How much should we defer to the trial court's credibility determinations? For its credibility determinations? Yeah. Well, I mean, the court's given deference on its analysis of credibility issues. Whether or not it's against the manifest weight of the evidence is a different story. All right. So my impression from the trial court was they found many of the statements made by Meyers not to be true and not to be indicative of bad faith, essentially. So how much deference should we be giving that in terms of the court's determination to award exemplary? I don't believe there should be much deference given to that because even assuming those findings are true, it still doesn't rise to the level that's required under the Maher case. All right. So you're saying it has to be tantamount to a crime, essentially, is the language from that case. Yes. Okay. Your argument, it's kind of a double sword argument. When Meyers testified that they were having cash flow problems, so you say, well, you can't award exemplary because there are cash flow problems. But can't the cash flow problems be looked at in respect to the zero commission when they said, oh, we're going to, you're not going to get any commission on these cases because you didn't make a profit. I mean, couldn't there be a reasonable inference made, maybe the trial court made a reasonable inference that the reason that they weren't paying as the contract set out or as he purports if the contract sets out, because they were having cash flow problems. Yes, that would be correct, Your Honor. And that was testified to, yes. At one point, the United States was thinking about shutting down. The business was so bad. In regards to material breach, the court found that it was supposed to be quite as an affirmative defense, but material breach is just a part of the elements of establishing a breach of contract case. So we believe it's a general defense, and the case law supports that. So the court's ruling regarding it needed to be, it was waived because it wasn't quite as an affirmative defense, is contrary to the case law. But the first time that was raised was in closing arguments, wasn't it? No, we had a cause of action in Atwater. I mean, it got directed verdict because of causation issues, but we had a counterclaim for that. At the trial court? Yes, absolutely. It was breach of the implied covenant of good faith and fair dealing. Right. Are there any other issues? Any questions? No. No? Okay. You can wrap up, and then remember you'll have more time. Yes. So that's the time, is that it? That's your time. Well, I guess I'll just output it then. Okay, great. Thank you. Mr. Metz. Good morning. May it please the court, Carl Metz, Metz Gilmore, and Beth Lebek on behalf of Charles E. Atwater Associates. With me here today is Grant Talabai, our associate, as well as in the courtroom is Mr. Clark Atwater, principal of Charles E. Atwater. I'm not going to recite facts, but I think as the panel noted, the court was pretty clear when it evaluated the facts. In quoting the court, there is no credible evidence to support the belief an agreement modifying a written contract was breached. This is his memorandum and pidget of page 8 in the record at 3973, volume 2. Well, what is your response to Mr. Dunlap that you're playing acquiesce by taking the checks, cashing them? Well, he absolutely did not acquiesce, and there's multiple reasons for that. Number one, he wasn't getting checks. He had to ask for checks. When he was getting checks, he wasn't even getting commission statements, so he didn't even know that they were getting zeroed out. As of the time he terminated the contract, he was six months behind, so that meant that he hadn't been paid. His last check was actually a make-up check for 14 months previous. So how can you acquiesce to something that, A, you're not getting your money, and, B, you're not getting the commission report? So there's no acquiescence. The record's replete with his testimony with respect to his inquiries as to when am I going to get paid? Why are you zeroing these outs? You've got to live by the contract. And there's a lot being made of this October 3rd conversation. And the court was right. There were zero outs previous to that. Mr. Atwater didn't know because he hadn't received a commission statement. But here's the other thing that's really telling about the defense theory. On October 7th, four days later, Mr. Atwater sent an email saying, hey, did you get a chance to look at those two zero outs? No response. None whatsoever. It's easy to conclude that there was no modification, there was no discussion. Because the natural response would be, hey, we talked about this. You're not getting paid. None of that anywhere. I'll get back with you. Let me look into it and I'll get back with you. And then he made this deal about 10,000 emails and everything else, and he never complained about the modification. Well, how can he complain about a modification if he doesn't know about it? In the trial testimony, Mr. Atwater stated that the first time he ever heard about the modification is when it was pled in the pleadings. So one doesn't complain about something they don't know about. And so that, I think, goes to the court's also conclusion that the court did not find the testimony of the NSS witnesses credible, particularly in the light of their convenient memories when confronted with their deposition testimony. That's a memorandum at pages 8 to 9, 3973 to 3974. So when it comes to the fact-finding, the panel is, I believe, required to stick with the court's findings of fact. The 3 percent, no less than 2 percent. The court said it's partially ambiguous, so he looked at the testimony. And the only testimony you had was of Mr. Atwater, who was a signatory of the agreement. He said 3 percent when there's a profit, 2 percent when there's no profit. And as the court pointed out in its decision, Mr. Atwater had no idea what they were making on these projects. He had no control over pricing. He was putting parties together, and his testimony is he'd find somebody that wanted a quote, he'd send it off to North States. North States would provide the quote. So Mr. Atwater had no pricing control whatsoever, so he has no idea what they're making. So naturally, he's not going to go out and sell something if he's not going to make any money on it. I mean, that's just human nature. Now, he worked here previously. He did. So that's a very good point. He had previously worked several years previous. There was no written contract. They terminated him. It was a handshake deal. Yes, yes. They saw him at some function or something, and they asked him to come back. And he said, well, I need a written contract. If I'm going to come back, I need a written contract. He demanded a written contract. You know, there's a lot been made about who drafted the contract. And I think we're pretty succinct in our brief about who drafted the contract. The trial court found that North States drafted it. Yes, and the document itself is pretty indicative of that. When you've got North States written all over the place, the exhibits on North States' letterhead, the North States' personnels, the names typed, written, and the only thing mentioned of the plaintiff is somebody hand-wrote Charles E. Atwater Associates. So the contract interpretation, you look at the language, you give meaning to all the words. They're trying to eliminate the poor order. I mean, clearly, you look at the language. He's getting commission in every order. There's no carve-out to say, well, you know, if we decide not to give you something, we're not going to give you something. That's where you've got to live with it. In their briefs, there was an argument on page 45 of the appellant's brief, arguing that the trial court's ruling that the term sales representative used in the contract, including NSS employees, but is the word sales contract in that argument at all? No, no. You're a sales representative. Going back to the commission, because I think that's where you're going, is the only carve-out for internal people, that's really what we're talking about, the internal salespeople, is the house accounts. The house accounts, and it was presented at trial, the house accounts was modified on a couple of different times. So there was always an opportunity for more states, if they wanted to, to say, hey, wait a minute, we're going to change the mouse accounts. We're putting this account in the house account. We're taking this one off. And so there's a history of written modification of that. So the carve-out for the internal people is just to add it to the house account. And in writing the contract, if they added it to the house account, Atwater didn't have a whole lot to say about it. There was no negotiation in that regard. And they make a little bit of noise about profit. Well, profit's not in the contract. Profitability is in the contract. And profitability is the degree to which a business or activity yields a profit or financial gain. So it's not written in the contract that there has to be some positive profit. As the panel pointed out, you know what, sometimes there is a loss. And, you know, I think sometimes people call them loss-eaters. Let's get in the door, let's sell them something. There's still value added by the salesperson. That's why the contract says 3%, no less than 2% per order. Never a situation where they don't get paid. You know, and there's this argument, and we've addressed it in the briefs, you know, to talk about course of performance somehow modifying the 3%, 2%. That's just nowhere. I mean, in fact, we pointed out in a brief, you know, they cited to something, they cited to a plaintiff's Exhibit 17, tried to show that they were, you know, modifying it. And that very exhibit showed that there was a profit of over 20%, and they didn't pay commission. I mean, they didn't even comply with their alleged modification. And I think what's a little bit missed on this whole alleged modification is the requisite requirements of a contract still have to be met, offer acceptance, you know, consideration, as I think it was pointed out earlier. In a lot of the cases that they cite to, you know, where there's this acquiescence to a modification, all those cases involve somebody saying, hey, I'm going to modify the contract. And there's no doubt that somebody made this offer, and the accepting party says no, but then the accepting party turns around and ends up, by its actions, acquiescing to the modification. We're missing that very first part. The house of cards, you know, it's like a house of cards. You pull out that first part, the whole thing collapses. You know, so there can't be this sort of mysterious modification. The waiver and estoppel from the defenses. The courts, if you read the actual firm of defenses for waiver, they have part of their allegations are involving as modified, the contract as modified. You know, there's a waiver because he agreed to a modification. There's an estoppel because he agreed to a modification. But he always complained. That's right. And he never agreed to it, so therefore, you know, they lose on their firm of defenses because it's undercutted by the very fact that, you know, there was no modification as the court found. The material breach. They didn't allege the material breach and the thing. But as the court found in the very beginning of his decision, Atwater proved that they breached and that he complied with what he was supposed to do. It was a litany of evidence. You know, he went producing evidence that during a four or five-year period, he made 1,500 in-person visits on behalf of North States as opposed to only 2,000 in-person visits on behalf of his five other principals. Clearly, he's out there hitting the pavement, knocking down doors. And as he testified, he had his territory. He worked from north to south. It was just sort of this repeating basis. When were you first aware of this affirmative defense of a material breach? I wasn't until we were at the end. There was no – it constantly points out they pled a breach of contract as in a counterclaim. That's by the action for which we were dealing. And that was directed out. The court made a directed finding on the counterclaim. So their breach was not affirmative defense. Their breach claim was a counterclaim. It's those that lost out at the trial court. And I'll point out, those are not at issue up on appeal. Right. The exclusive territory, I think the exclusive territory is self-explanatory by the definition of what's in there. Exclusive representation, the territory agreed upon by the agency and North State Steel Corporation will be northern Illinois. All areas north of I-9, including Rockford, Freeport, Illinois, and Wisconsin. Exclusive of the house accounts. Just exactly where I was going to go. She exhibited A4 lists of North State Steel house accounts. These house accounts were made exclusive accounts for North States. So the come out is you've got this area, and the only way to pull out is this list. Everything else is yours. And as the court found, we get paid for everything in there. I mean, it's just sort of the sort of quick pull quote, if you will, of sales people. You're going to knock on a lot of doors and not get any sales. One day you might drop off a pamphlet and get a whole bunch of sales. It just sort of comes out in a wash, so to speak. Would there be any need to specify the house accounts with respect to this territory? North States has to specify their house accounts. So he knows, all right, these I can't touch. Everything else is his. It wasn't addressed, but I think it's pretty clear that the Illinois Sales Representative Act has no bearing on this exclusive territory. It's defined by the contract. The court found, and again, the court's been giving great deference to their findings of fact with respect to the exemplary damages. As we pointed out and as the court pointed out, the contract was terminated December of 2012. We're pushing 11 years from now. And as at that time, he knew they were six months behind. As we got into litigation, it was discovered there were a litany of other commissions that won't be paid. And as we got into litigation, there was a litany of individuals or companies in this territory that weren't even disclosed that ended up adding on to this thing. So the records were complete with, I guess, the villatory tactics of North States Steel. So what do you think the rationale is behind the basis or the rationale behind the sales act? Well, I think the basis behind the rationale is so that sales representatives don't get stiffed by manufacturing. It's a hard business. I mean, it's really, I mean, you know, as a negative to the first experience, you know, he's got this handshake deal, and what really happens is the company decides, well, you know what, we've got contacts with all these customers. We don't need this guy anymore. And we'll just keep selling after he's built up this base, you know, for them. So I think the rationale is. It's to protect them. It is, absolutely. And that's why, and I'll play it on to my, the attorney's piece and everything else. You know, that's why the act has the exemplary damages as well as the attorney fee provision, so that there's some teeth in the act, so that there's some penalty, so that, you know, companies are dissuaded from doing what happened to Charles E. Atwater & Associates. Well, what do you say to their argument, though, that it wasn't, they weren't acting in bad faith because Ms. Myers did testify that they were having cash flow problems? Well, as the court points out, it's, cash flow problems has no relation to whether or not Atwater was entitled to commission. As the court pointed out, they got paid on those sales. So, you know, you get $100,000 in, he's entitled to 2% of that. You've got $3,000 right there now to pay him. Instead, they chose, you know, if they're to be believed, they chose to do something else with that money and say, you know what, he can wait. He can wait. You know, and that's why the court's comment, the court finds the actions of defense withholding or reducing payments and making payments or commissions dependent on their cash flow issue meets the level of outrageousness. And so the court, I mean, I think it's pretty clear, didn't take lightly, you know, the burden on us to prove the, you know, the outrageous conduct. And I think, you know, you add it all together, you know, with this 7% theory. You know, at one point they didn't talk about appeal, they were having this theory about having to walk in every door every four to five weeks. It's just the constant battle that they were putting Atwater through. And we're still, you know, some of these commissions go back 15 years. And we're still fighting over it. If I could, I'd like to move into my cross appeal as well as my second appeal. So the cross appeal is. Let's talk about, do you mind talking about prejudgment interest? That's what I was going to talk about first. Okay. So I think the act is pretty clear and I think there was just a little bit of confusion with the trial court. So the act is at 815 ILCS 205-2. It states predators shall be allowed to receive at the rate of 5% per centum per annum for all monies after they become due, and I'll go dot, dot, dot, other instrument of writing. That's what's applicable here. You know, so 5% on any other instrument of writing. The argument that was offered that the court accepted is if you go down to the last sentence, the separate sentence in the act. In the absence of an agreement between the creditor and debtor governing interest charges upon 30 days written notice to the debtor, an assignee or agent of the creditor may charge and collect interest as provided in this section on behalf of the creditor. So the notice requirement is if we had assigned our debt to somebody else to go out and collect, and they wanted to collect interest, then they would have to provide 30 days written notice in order to trigger the interest act. But we're collecting it ourselves. We're entitled to interest. So what are the issues? We're owed money. We're owed at 5% annum, and it's on other instrument of writing. Other instrument of writing is something that creates a debtor-creditor relationship. We're the creditor. We didn't work. They owe us money. You know, the contract's fixed and determinable. So we cited two cases. It is fixed and determinable just because it's a calculable number. It's 3%, no less than 2%. 3% on something that's profit, 2% on something that's not profitable. So it's clearly distinguishable. And we cited two examples where there were brokerage accounts and insurance agreements. But similarly, you know, you sell an insurance policy, you're entitled to commission on whatever the policy is. So that's, you know, easily calculable. And same concept, easily calculable. So it is determinable. Just because they disagree with an amount or whether or not they owe something does not make it incalculable. That's just a unilateral thing that's not applicable. What's our standard of review here? Is it abuse of discretion or is it de novo? I think this is de novo because it's an interpretation of the statute. And the court specifically said in its opinion that it was denying our request for failure to comply with the statute. And then as I'm coming to the end of time, I'd just like to briefly address our second appeal on attorney's fees. So the Federal Sales Representative Act has provision that entitles us to attorney's fees. And so the court at the end of the decision said, submit your attorney fee petition with your attorney fee petition. And three months on pay, I mean, the case has been dragging on. So the petition was long. And I'm just going to sort of jump to, I think, the crux of the issue rather than go through the whole fee analysis. The court reviewed, as it said, all of our information. And the court went through and said, you know what? I'm going to knock off $18,000 and change because I can't figure out what you're doing this month. And I came on late in the case and said, Mr. Metz, even though what you did was necessary, I think there's some overlap. I'm going to take that off. He said, I subtract all that out, I come up with $924,000. He determined that to be reasonable. The rest of it should not have occurred. It's a common force out of the facts. And I'll rely upon my brief for the rest of that. Thank you very much. Thank you. Questions, gentlemen. Justice Burkett. Thank you. Thank you. The same Dunlap? Yes. Okay. Mr. Dunlap, come on back up. Let me ask you real quickly. Mr. Atwater is asking for an award of $110,709.68 in prejudgment interest. Yes. On appeal, you argue only that Atwater is not entitled to prejudgment interest. Are you acknowledging that that amount is correct or he's just not entitled? He's just not entitled. We're agreeing with what the trial court did and the trial court's analysis. But you're not making any reference with respect to the amount? The amount of the interest in terms of his calculation? Right, right. No, we did not make that argument. Okay. Thank you. No problem. Okay. So Atwater unequivocally testified that from 2008 on, he was regularly receiving commission reports showing zeroed out commissions. Yes, there were a couple times when commission reports were not received, but he received over 40 commission reports that contained zero outs during a little over a three-year period. So to claim that he was not aware of this and he could not get this information is just belied by the evidence. In regards to the material breach, evidence was introduced that Atwater was spending over 80% of his time working for a direct competitor and that was an email written by Mr. Atwater himself. It's clear that Atwater knew of the contract modification. Let me go back to the 80% working for a direct competitor. When was that statement made? That was an email that was sent by Mr. Atwater,   Was there any action filed? Yes. Yes, that was the breach implied having a good faith and fair dealing action. It was dismissed based upon causation issues. As I mentioned earlier, Atwater did not send any emails objecting to the zero outs and testified that he regularly received these commission reports from 2009 on. Prior to that, Atwater was receiving invoices, like a stack of invoices with a check on top, because that's what was requested, but later on that changed in around summer of 2009 and from that period on, Atwater testified that he was receiving regular commission reports that were zeroed out. This case has been going on an awful long time. Yes. Mr. Dunlap, what was the holdup? At the beginning, Mr. Metz did not get involved until I believe it was 2017. Prior to that, there was two other attorneys and there was just a fight about everything, every little discovery dispute and it just kept going on and on and on. There was so many motions filed. I couldn't even tell you how many at this point in the first couple of years. I believe at one point there may have been 25 motions filed related to discovery. Depositions didn't even really start moving forward until Mr. Metz got involved in the case. And then COVID happened during the middle of this as well. Is there anything the court would like me to focus on? I mean, we've made the majority. Do you want to respond to the argument on the cross appeal? Which specific argument? About the standard of review, reasonable attorney's fees? Standard of review, reasonable attorney's fees. And also the interest issue, which you did not address counsel's argument that it's the creditor himself. This is not an assigned debt. That is correct. The public policy behind due process supports notice. That was one of the arguments that we included in our reply brief. And it's just counterintuitive if you think about it, that the creditor wouldn't have to give the debtor notice if an assignee or an agent would have to. And that's essentially what the trial court found. And that's how we believe that the act should be interpreted. I mean, without notice, how are you supposed to know what they're expecting out of you? And the interest actually wasn't even brought up for the first time in this case until 2018, I believe. In regards to attorney's fees, I mentioned earlier that if the court does find there was a modification, the whole issue of attorney's fees should be reversed, because then it doesn't get to the Sales Representative Act, because there's no late payments that would trigger that. In the event that the court does not find that, though, the trial court did not abuse its discretion under the Lodestar Act. There was not a common core of facts. For example, the exclusivity account, that has nothing to do with Atwater's commissions that were not paid. That has to do with actions taken by North State's employees in a specific territory that's not connected to Atwater not being paid commissions between 2% and 3%. Say that again? The exclusive territory argument about how, like, the common core of facts here, this has to do with a contractual remedy, I guess, that was performed by the trial court when the court made its determination that that paragraph inferred exclusivity. So that finding, those facts there have nothing to do with the common core of facts about Atwater's main cause of action for breach of contract, which was the late payment of commissions. Well, wouldn't they have something to do with the determination of fees earned? It was a contractual remedy. The exclusivity or lack of exclusivity? It was a contractual remedy performed by the court. He just imputed the paragraph 2 for the breach that was, I guess, found by the trial court. And that's just one example. Atwater brings up that he's the victim, and it's just not true. And, like, all this talk about North states delaying the case and, you know, malicious intent to, you know, not pay Atwater is just not supported by the record. In regards to the statutory interest in an Illinois interest act, this was within the trial court's discretion because it was based upon a question of fact. Let me ask you, what standard of review do you think we use with respect to that?  And in regards to whether or not the commission payments were readily calculable under the Illinois interest act, they're not liquidated or subject to easy consultation. I mean, the amount of commissions due took trial court's ruling and interpretation on the ambiguities of the commission section and the enforceability of the contract modification. Any other questions? Justice Kennedy, any questions? Thank you very much. Thank you. Yes, thank you. So let me first touch upon the interest act. The interpretation of the statute is a de novo review. And I believe the court, by stating that we didn't comply with the statute, you know, that's the court's interpretation. So that's a de novo review. Manifest way to the evidence goes to whether or not we're owed money. The amount. Yes. And the court clearly found we're owed money. So that's the distinguishing effect there. You know, the amount of interest is in a spreadsheet. We've calculated it in a brief. As the court pointed out, it's 110,000 to change. That leads up to the month before the judgment, after which the judgment statute of interest would apply. So I think that's something that would need to be remanded. It's something that the appellate court can just remand for entry of judgment in that amount. The 80% of time you vote for another competitor. They didn't proceed on that because of court. Yes. It's an unfair snapshot. I mean, I think we addressed it in our brief. It's an e-mail sent to another manufacturer that was never to be determined to be actually a competitor. That's their assertion. The competitor that they claim sold aluminum. North State's didn't. Number two, nothing in the contract prohibited what he did. The contract's pretty clear. Not compete kicks in upon termination. Three, if you recommend. Wait a minute. He can't compete after termination, but he can compete during his contract? Well, that's what the contract says. That doesn't make any sense. That's what the contract says. But we're saying he wasn't competing anyway. I mean, it was clearly somebody that was selling a different product. It was aluminum versus galvanized steel, galvanized. Go ahead. Galvanized steel, galvanized steel. And just to finish up the point, if you read the testimony, the 80%, which is a number he threw at somebody because he was going through a difficult time in his life. His granddaughter had just passed away. They were on his back. He responded. And if you look at the testimony of the trial, I mentioned the statistics. He actually did 1,500 visits for North State's, 2,000 visits for everybody else. Clearly the bulk of his time was with North State. So the 80% is just some red herring. No. The one thing that Mr. Dunlap talked about was 2009, he was getting commission receipts or reports. He was late. But he wasn't getting late commission reports. And then it just became sporadic. And the check would come to square. It got to the point where in the testimony, he'd have to call up the principal at North State and say, hey, can I get a check? Can I get a check? He'd drive to Huber and he'd get a check. He wouldn't necessarily get a commission report. Thank you. Any other questions? I know my time is up. Thank you. Thank you, gentlemen. Thank you for a very interesting argument and the time that you put into this case. We will take the case under consideration and render judgment in due course. We'll stand in recess until our next meeting.